UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BENJAMIN LEVY, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 1255 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| PETER O'ROURKE, Secretary, United States Department of Veterans Affairs, | ) ) | |
| | ) | |
| Defendant. | ) | |

### **MEMORANDUM OPINION AND ORDER**

Benjamin Levy, a police officer employed by the United States Department of Veterans Affairs (the "VA"), sues Peter O'Rourke, in his official capacity as VA Secretary, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that he was discriminated against on the basis of race and retaliated against for protected activity when the VA disciplined him for behaving inappropriately toward a VA hospital visitor and refusing to cooperate with the ensuing investigation. Doc. 1. The VA moves for summary judgment. Doc. 48. The motion is granted.

### **Background**

The court recites the facts as favorably to Levy as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chicago*, 916 F.3d 631, 633 (7th Cir. 2019).

Levy, an African-American male, is VA police officer. Doc. 61 at ¶ 28; Doc. 59 at p. 1, ¶ 2. He has worked as a VA police officer from the 1990s to the present and has been stationed at the Hines VA Hospital since 2004. Doc. 59 at pp. 1-2, ¶¶ 3-4.

1

On July 30, 2016, while on the night shift, Levy received a call asking him to pick up E.F., a woman visiting a Hines patient, and drive her to the Fisher House, a lodging for visitors. *Id*. at p. 2, ¶ 5. Levy met E.F. and asked her to get into the front seat. *Id*. at p. 2, ¶ 6. Levy then shook her hand and jokingly said, "Hey, let her go. Hand, let her go. Just—she's a nice lady. Let her go." *Id*. at pp. 3, ¶¶ 7-8. (Levy objects to this fact, arguing that the cited evidence does not support it, but Levy testified at his deposition that he "shook her hand" and made that "joke." Doc. 51-1 at 32.)

The next day, a Hines social worker informed Officer Felicia Strozier that E.F. had complained that Levy harassed her. Doc. 59 at p. 3, ¶ 9. Officer Strozier interviewed E.F., who reported that Levy had made improper explicit sexual remarks and advances. *Id*. at p. 3, ¶ 10. (Levy objects to this fact and others concerning E.F.'s account of his conduct. *Id*. at pp. 3-6, ¶¶ 10-18. But those facts reflect only what E.F. told Officer Strozier, Captain Cary Kolbe, and others, and are not set forth for their truth. *See Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 796 (7th Cir. 2015) (holding that a negative reference from the plaintiff's former employer was not hearsay because it had been "considered not for its truth, but to show its effect on the state of mind" of the defendant hospital in rejecting the plaintiff's application); *Schindler v. Seiler*, 474 F.3d 1008, 1011 (7th Cir. 2007) ("[A] statement offered to show its effect on the person who heard the statement is not hearsay."); *Bergholz v. John Marshall Law Sch.*, 2020 WL 1066248, at *2 (N.D. Ill. Mar. 5, 2020) ("The court sets forth the complaints not to credit their validity, but solely for the fact that [the relevant decision maker] received them."). Levy does not argue that the facts articulated here fail to accurately reflect what E.F. told Strozier in her initial interview, told others in her later interviews, or set forth in her witness statement.)

E.F. told Officer Strozier that Levy took her hand, did not let go, and said that it "was the softest hand he's touched in a long time." Doc. 59 at p. 4, ¶ 11. E.F. added that Levy "said that he was tired until he picked [her] up and saw [her]," and that seeing her "woke him up and lil mister between his legs." *Id*. at p. 4, ¶ 12. E.F. added that, in an attempt to change the subject, she asked Levy what a nearby apartment building was used for, and that he responded that the building was "where women serviced the veterans and that they have most problems with that building cause the women don't want to leave cause there are certain times the women have to leave." *Id*. at p. 4, ¶ 13. E.F. stated that Levy giggled and said, "you know what I mean." *Id*. at p. 4, ¶ 13. E.F. added that Levy "kept telling me he could smell my perfume and boy does it smell good and makes him and his Mr. feel good to[o]," and would say, "you know what I mean," each time he referred to "his Mr." *Id*. at pp. 4-5, ¶¶ 14-15 (alteration in original).

E.F. told Officer Strozier that upon arriving at Fisher House, Levy gave her his card, told her that he got off work at 2:00 a.m., offered his personal phone number, and suggested that he could "swing by." *Id*. at pp. 5-6, ¶ 17. E.F. stated that although she declined his invitation, she saw him return later that evening, driving by the Fisher House about four times. *Id*. at p. 6, ¶ 18. E.F. recounted that she "was so scared after [she] got back to [her] room" that she "called [her] sister and told her[] [she] was crying cause [she] was in fear he was gonna get to [her] and [she] was going to be raped." *Id*. at p. 5, ¶ 16.

Based on E.F's allegations, Levy's shift supervisor removed his badge, credentials, and firearm that day (July 31, 2016). *Id*. at p. 12, ¶ 32. Officer Strozier and Captain Kolbe then interviewed Levy. *Id*. at pp. 6-7, ¶ 19. In Officer Strozier's assessment, Levy changed his story at least four times during the interview. *Ibid*. Officer Strozier wrote in her report that Levy "indirectly admitted to being flirtatious with E.F." and "stated he may have said something along

3

the lines of him being excited but was referring to [E.F.]'s father and her feeling good and she might have took it the wrong way." *Id*. at p. 7, ¶ 20 (alteration in original). Officer Strozier noted that Levy confirmed that he told E.F. when he would be off work, gave her a card, and told her to contact him if she needed anything. *Id*. at p. 7, ¶ 21. According to Captain Kolbe's report, Levy acknowledged he "may have told [E.F.] that her hands [were] very soft" and that he "could have said that" he had not "touched anyone['s] hand for a long time and it was nice." *Id*. at pp. 8-10, ¶ 25.

That same day (again, July 31, 2016), Chief Gary Marsh reassigned Levy from the night shift to the day shift. Doc. 59 at pp. 12-13, ¶ 34. While reassigned, Levy maintained his rank and continued to work full time at his normal pay rate, though he lost some opportunities for overtime, shift differential, and weekend and holiday pay. Doc. 59 at p. 13, ¶ 35. As Levy characterizes it, during the time of his reassignment he was subjected to two separate investigations—the second beginning after he filed an EEO charge against Marsh on August 3, 2016. *Id*. at pp. 13-14, ¶ 36.

Following a request from Human Resources Specialist Estella Guerrero, *id*. at pp. 14-17, ¶¶ 38-43, Lieutenant Joseph Ellena informed Levy that he would be required to sit for an investigative interview on October 20, 2016, *id*. at p. 17, ¶ 44. Levy refused to answer questions unless the United States Attorney's Office provided him with a *Garrity* letter promising that his answers would not be used in any criminal prosecution against him. *Id*. at p. 17, ¶ 45; *see Garrity v. New Jersey*, 385 U.S. 493, 497-98 (1967) (holding that where a government employee suspected of misconduct is questioned and given the choice "either to forfeit [his] job or to incriminate [him]self," his "statements [are] infected by the coercion inherent in [that] scheme of questioning and cannot be sustained as voluntary"). (Although Levy objects to this fact, the

cited evidence shows that his attorney informed Lieutenant Ellena that he was "instructing Officer Levy to decline to answer any additional questions in the absence of an assurance by the U.S. Attorney's office that his answers are not going to be used for the purposes of criminal charges against him." Doc. 51-10.) Having never received a *Garrity* letter, Levy refused to appear for additional meetings or interviews. Doc. 59 at pp. 17-19, ¶¶ 46-49. As a result, Chief Marsh issued Levy a written notice of a proposed fourteen-day suspension for (1) inappropriate conduct and (2) failure to cooperate with the investigation. *Id*. at pp. 19-20, ¶ 50. On March 28, 2017, concluding that the charges had been sustained by a preponderance of the evidence, Chief Marsh suspended Levy for fourteen days. *Id*. at pp. 20-21, ¶ 53.

Levy identifies Captain Kolbe as a similarly situated comparator. Doc. 58 at 8-16. In 2010, Kolbe, who is white, started following Sheirys Bredemeir, a female VA employee, around Hines, asking her on dates and staring at her in her work area. Doc. 61 at ¶ 1. In 2010, Kolbe appeared at Bredemeir's house and told her he ran her license plates to find her address. *Id*. at ¶ 2. In 2010 or 2011, Bredemeir told Assistant Chief James Runge that Kolbe was harassing her. *Id*. at ¶ 3. After that, Kolbe continued to follow Bredemeir and stare at her. *Ibid*. In 2012, Bredemeir met with police management, Chief Donald Gardiner, Assistant Chief Runge, and a union representative and informed them that Kolbe was still harassing her, yet the harassment persisted. *Id*. at ¶ 4.

In May 2013, Kolbe circled Bredemeir's table in the cafeteria, followed her, and audibly commented on her "perfect ass." *Id*. at ¶ 5. Bredemeir again complained, this time to Chief Marsh. *Id*. at ¶ 6. Bredemeir told Chief Marsh that Kolbe "had been harassing her for years, … would make inappropriate remarks, would stalk her around Hines, [and] would continuously stare at her." *Id*. at ¶ 7. Chief Marsh did not take any notes during the meeting and told

Bredemeir that he did not see Kolbe behaving in that way. *Ibid*. Kolbe did not stop harassing Bredemeir following that meeting. *Ibid*.

Bredemeir continued complaining about and trying to end Kolbe's harassment. She informed Hines Associate Director Daniel Zomchek about Kolbe's behavior, *id*. at ¶ 9, and filed a police report, *id*. at ¶ 10, an EEO charge, *id*. at ¶ 11, and a lawsuit, *id*. at ¶ 12. The harassment continued. *Id*. at ¶ 12. At no point did Chief Marsh discipline Kolbe or take his credentials. *Id*. at ¶ 17. Rather than assign an officer to investigate Kolbe's behavior, Chief Marsh personally interviewed him and Bredemeir. *Ibid*; Doc. 59 at p. 22, ¶ 56. After speaking with both, Chief Marsh believed Kolbe's explanation, determined that Bredemeir had misinterpreted his behavior, and concluded the investigation. Doc. 59 at p. 22, ¶ 57.

## Discussion

Levy alleges that the VA violated Title VII by discriminating against him based on his race and retaliating against him after he filed an EEO charge against Marsh. Doc. 1. Title VII's discrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)).

Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that his protected characteristic or activity caused an adverse employment action. *Id*. at 765. To meet this burden, the plaintiff may

6

rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *see Ortiz*, 834 F.3d at 765-66, but that framework is just one way that the record can allow a reasonable jury to find race discrimination or retaliation, *see Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* provides "a common, but not exclusive, method of establishing a triable issue of intentional discrimination") (internal quotation mark omitted). The court therefore must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether, in its entirety, "the evidence would permit a reasonable factfinder to conclude that … [a] proscribed factor caused the … adverse employment action." *Ortiz*, 834 F.3d at 765; *see also Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1004-05 (7th Cir. 2018) ("Although the oft-cited burden shifting framework from [*McDonnell Douglas*] provides a means of organizing, presenting, and assessing circumstantial evidence, we must consider the evidence as a whole in deciding whether to grant summary judgment.") (citations and internal quotation marks omitted).

Because the parties present their arguments under *McDonnell Douglas*, the court will "begin [its] assessment of the evidence by employing [the *McDonnell Douglas*] construct and address[ ] first whether [Levy] has established" a genuine dispute under that framework. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). If Levy fails to do so, the court will then "assess cumulatively all the evidence" on which he relies "to determine whether it permits a reasonable factfinder to determine" that Levy was disciplined more harshly because of his race or protected activity. *Ibid*.

The *McDonnell Douglas* framework allows Levy to forestall summary judgment if he adduces evidence showing that he (1) belonged to a protected class or engaged in protected

activity, (2) met his employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was similarly situated to at least one other employee who was not a member of the protected class and who was treated better—together, his *prima facie* case—provided that the VA fails to articulate a reasonable alternative explanation for his adverse treatment or he shows that the proffered alternative explanation is a pretext for discriminatory animus. *See id*. at 225. Levy does not dispute that he failed to meet the VA's legitimate business expectations, and instead hinges his *McDonnell Douglas* argument on the theory that the VA discriminatorily applied those expectations. Doc. 58 at 7. That is an appropriate approach; faced with evidence that he failed to meet his employer's legitimate expectations, a plaintiff may argue under *McDonnell Douglas* that the employer applied those expectations in a discriminatory manner. In that situation, "the second and fourth prongs [of the *prima facie* case] merge—allowing [a] plaintiff[] to stave off summary judgment for the time being, and proceed to the pretext inquiry," by showing that his employer disparately applied its expectations. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010) (internal quotation mark omitted). The merging of the second and fourth prongs reflects that "[d]iscrimination may be inferred when an employer treats an employee in a protected class less favorably than it treats a similarly-situated employee outside that class." *de Lima Silva v. Dep't of Corrs.*, 917 F.3d 546, 559 (7th Cir. 2019).

Where the plaintiff offers evidence sufficient to establish his *prima facie* case, the *McDonnell Douglas* framework requires, if the employer offers a non-discriminatory reason for its decision, that the plaintiff provide evidence of pretext—that is, that his employer "did not honestly believe in the reasons it gave for terminating [him]." *Montgomery*, 626 F.3d at 397 (alteration in original) (internal quotation mark omitted). To demonstrate pretext, a plaintiff must show "such weaknesses, implausibilities, inconsistencies, or contradictions in [the

8

employer's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the employer] did not act for the asserted nondiscriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 743-44 (7th Cir. 2011) (alteration in original) (internal quotation marks omitted), *overruled in other part by Ortiz*, 834 F.3d at 764-65. Where, as here, "a plaintiff claims … that an employer's legitimate expectations were disparately applied, the second and fourth elements of the *prima facie* case are closely intertwined with the pretext analysis, and the two inquiries may be merged and considered together." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). As a result, "evidence of similarly situated employees who were treated more favorably than the plaintiff can be offered to show that the [employer's] proffered reason for the adverse employment action is pretextual." *Dotson v. AT&T Servs., Inc.*, 524 F. App'x 271, 274 (7th Cir. 2013); *see also Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012) ("[S]elective enforcement of a rule calls into question the veracity of the employer's explanation.") (internal quotation marks omitted); *Curry v. Menard, Inc.*, 270 F.3d 473, 479 (7th Cir. 2001) (holding that "evidence that … non-black cashiers[] were not suspended or terminated despite the fact that they" engaged in misconduct similar to the plaintiff's "creates a genuine issue of material fact as to whether [the employer]'s stated reason for discharging [the plaintiff] was a pretext for discrimination"); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory

9

reason for the adverse job action was a pretext for racial discrimination.") (quotation marks and citation omitted).

At the end of the day, then, the question whether Levy can fend off summary judgment under *McDonnell Douglas* turns on whether he has adduced evidence sufficient to find that he and Kolbe were similarly situated. "[W]here the plaintiff alleges the employer disciplined him more harshly than his comparator, the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor, rather than job description and duties." *de Lima Silva*, 917 F.3d at 559 (internal quotation marks omitted); *see also Woods v. City of Berwyn*, 803 F.3d 865, 872 (7th Cir. 2015) ("To be a sufficiently similar comparator, the individual ordinarily should have dealt with the same supervisor, been subject to the same standards, and engaged in similar conduct of comparable seriousness."). In deciding whether two employees have engaged in similar misconduct, "[t]he critical question is whether [they] have engaged in conduct of comparable seriousness." *de Lima Silva*, 917 F.3d at 559 (internal quotation marks omitted). "Conduct may be comparably serious if it violates the same rule or is of a similar nature." *Ibid*.

It is undisputed that one of the two bases for Levy's suspension was his "failure to cooperate with the investigation" against him. Doc. 59 at pp. 19-20, ¶ 50. It is likewise undisputed that Levy failed to appear for investigatory meetings because the VA would not provide him a *Garrity* letter. *Id*. at pp. 17-19, ¶¶ 45-49. By contrast, there is no evidence that Kolbe refused to cooperate in the investigation of his alleged misconduct. Thus, even assuming that Levy's and Kolbe's harassing actions were of similar seriousness and that Marsh was the relevant decision maker for both, Levy was disciplined in substantial part because of conduct—his refusals to cooperate—in which Kolbe did not engage. Given this significant distinction,

Kolbe is not similarly situated to Levy. *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 n.3 (7th Cir. 1997) (holding that because the plaintiff's alleged "'comparables' did not engage in all of the same misconduct" as the plaintiff, they did "not raise a genuine issue of material fact" as to whether the employer discriminatorily enforced its rules in violation of Title VII).

Levy's only retort is to observe that his failure to cooperate, which began in October 2016, cannot explain the VA's actions in July and August—its temporary removal of his badge and gun, transfer of him from the night shift to the day shift, and request that he sit for a second investigatory interview. Doc. 58 at 9. That is correct, but the ways in which Levy's misconduct differed from Kolbe's—it occurred at night, took place in the confined space of his vehicle, involved physical touching, and caused a Hines visitor to almost immediately complain that she feared for her safety—justified the interim measures the VA took against Levy in July and August. Doc. 59 at p. 5, ¶ 16. The particulars of Levy's misconduct surely would lead a reasonable employer, pending the outcome of an investigation, to take away an officer's weapon and remove him from the night shift, and that is precisely what the VA did. By contrast—and without excusing his reported misconduct in any way—there is no evidence that Kolbe harassed Bredemeir in a confined space, that he physically touched her, or, more importantly, that his shift assignment exacerbated the effects of his reported misconduct. Because those are vital features for understanding the VA's initial responses to Levy's misconduct, Kolbe is not a similarly situated comparator as to Levy's reassignment and temporary loss of credentials.

As for the VA's request that Levy sit for a second investigatory interview, that is too minor to constitute a "materially adverse" action for purposes of his discrimination claim, meaning an action "more disruptive than a mere inconvenience or an alteration of job responsibilities." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013) (internal

quotation marks omitted); *see Malekpour v. Chao*, 682 F. App'x 471, 474 (7th Cir. 2017) ("An adverse action for a discrimination claim must materially alter the terms or conditions of employment to be actionable.") (internal quotation marks omitted); *Harris v. Illinois*, 2014 WL 2766737, at *8 (N.D. Ill. June 18, 2014) (rejecting the plaintiff's argument that a reprimand alone was an adverse employment action given that the reprimand's "consequence[s] [were] not sufficiently tangible") (citing *Mitchom v. Bi-State Dev. Agency*, 43 F. App'x 958, 959 (7th Cir. 2002)). The request that Levy sit for a second interview also is too minor an inconvenience to qualify as a materially adverse action for purposes of his retaliation claim. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("An employee's decision to report discriminatory behavior cannot immunize that employee from … minor annoyances."); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 886 (7th Cir. 2012) (holding that, where an employee was investigated for misconduct, "the investigation itself was not an adverse action" for purposes of a Title VII retaliation claim).

Because Levy's refusal to cooperate with the VA's investigation and the particular context of his alleged misconduct distinguish his reported misconduct from Kolbe's, Levy has failed to make his *prima facie* case and failed to rebut the VA's non-discriminatory explanation for his treatment. Accordingly, Levy cannot forestall summary judgment under the *McDonnell Douglas* framework.

As noted, the court now must proceed to consider whether Levy has adduced evidence that, considered as a whole, would allow a reasonable jury to find that his protected activity caused the adverse employment action. *See Ortiz*, 834 F.3d at 765. Levy has not done so. He presents no evidence of racial discrimination not considered above. As for retaliation, the only evidence—other than the treatment afforded Kolbe—that Levy offers to show that Marsh

retaliated against him for filing an EEO charge is Marsh's supposed testimony, in a different lawsuit, that Marsh "stayed at Hines because [he] felt committed to stand up against individuals that would file complaints for the sole purpose of trying to get money from the agency when nothing was due to them." Doc. 61 at ¶ 32. But the portion of the deposition transcript cited by Levy does not contain that testimony, but rather shows that the questioning attorney—not Marsh—uttered those words and that at no point did Marsh meaningfully embrace that characterization of his motivations. Doc. 59-1 at 228. And in any event, that testimony is from a deposition in a different plaintiff's lawsuit, and Levy does not even attempt to satisfy his burden of offering a basis for its admissibility here. *See* Fed. R. Civ. P. 32(a)(8) ("A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action. A deposition previously taken may also be used as allowed by the Federal Rules of Evidence."); *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994) (declining to consider at summary judgment "pages of depositions taken in other actions" because "the other actions were [not] between the same parties or their representatives or successors in interest" and the defendants offered no alternative basis for their admissibility) (internal quotation marks omitted); *Hughes v. City of Chicago*, 673 F. Supp. 2d 641, 651-52 (N.D. Ill. 2009) (holding that although "a party may rely on deposition testimony from a separate action where the case involved the same parties and subject matter … [,] the burden of proving that the deposition testimony is admissible falls on the proponent of the testimony"). Accordingly, Levy cannot forestall summary judgment under the broader causation standard articulated in *Ortiz*.

**Conclusion**

The VA's summary judgment motion is granted. Judgment will be entered for the VA and against Levy.

March 26, 2020

_____
United States District Judge

14